# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**WE INFORM, LLC, et al.**
**Defendants.**

**CIVIL ACTION NUMBER: 24-cv-4037**

**Status Conference**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**INFOMATICS, LLC, et al.,**
**Defendants.**

**CIVIL ACTION NUMBER: 24-cv-4041**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**THE PEOPLE SEARCHERS, LLC, et al.,**
**Defendants.**

**CIVIL ACTION NUMBER: 24-cv-4045**

---

Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, New Jersey 08101
Monday, June 29, 2026
Commencing at 10:01 a.m.

**B E F O R E:** **THE HONORABLE HARVEY BARTLE, III, UNITED STATES DISTRICT JUDGE (EDPA)**

Kimberly Wilson, Federal Official Court Reporter
Kimberly_Wilson@njd.uscourts.gov
(609)815-2751
Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

(Captions continued on next page.)

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4075**
**vs.**

**DM GROUP, INC., et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4080**
**vs.**

**DELUXE CORP., et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4096**
**vs.**

**DELVEPOINT, LLC, et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4098**
**vs.**

**QUANTARIUM ALLIANCE, LLC, et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4103**
**vs.**

**YARDI SYSTEMS, INC., et al.,**
**Defendants.**

---

**(Captions continued on next page.)**

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4141**
**vs.**
**DIGITAL SAFETY PRODUCTS, LLC,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4143**
**vs.**
**CIVIL DATA RESEARCH, LLC, et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4160**
**vs.**
**SCALABLE COMMERCE, LLC, et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4174**
**vs.**
**LABELS & LISTS, INC., et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4176**
**vs.**
**INNOVIS DATA SOLUTIONS, INC.,**
**Defendants.**

---

**(Captions continued on next page.)**

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**ACCURATE APPEND, INC., et al.,**
**Defendants.**

**CIVIL ACTION NUMBER: 24-cv-4178**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**ZILLOW, INC., et al.,**
**Defendants.**

**CIVIL ACTION NUMBER: 24-cv-4256**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**EQUIMINE, INC., et al.,**
**Defendants.**

**CIVIL ACTION NUMBER: 24-cv-4261**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**THOMSON REUTERS CORP., et al.,**
**Defendants.**

**CIVIL ACTION NUMBER: 24-cv-4269**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**MELISSA DATA CORP., et al.,**
**Defendants.**

**CIVIL ACTION NUMBER: 24-cv-4292**

---

**(Captions continued on next page.)**

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4324**
**vs.**

**RESTORATION OF AMERICA, et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4345**
**vs.**

**i360, LLC, et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4383**
**vs.**

**ACCUZIP, INC., et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4385**
**vs.**

**SYNAPTIX TECHNOLOGY, LLC, et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4389**
**vs.**

**JOY ROCKWELL ENTERPRISES, INC., et al.,**
**Defendants.**

---

**(Captions continued on next page.)**

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4434**
**vs.**

**E-MERGES.COM, INC.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4609**
**vs.**

**NUWBER, INC., et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-4664**
**vs.**

**ROCKETREACH LLC, et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-5600**
**vs.**

**PROPERTYRADAR, INC., et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-5656**
**vs.**

**THE ALESCO GROUP, L.L.C., et al.,**
**Defendants.**

---

**(Captions continued on next page.)**

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-5658**
**vs.**

**SEARCHBUG, INC., et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-5775**
**vs.**

**AMERILIST, INC., et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-7324**
**vs.**

**US DATA CORP., et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-8075**
**vs.**

**SMARTY, LLC, et al.,**
**Defendants.**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,** **CIVIL ACTION NUMBER:**
**Plaintiffs,** **24-cv-8451**
**vs.**

**COMPACT INFORMATION SYSTEMS, LLC, et al.,**
**Defendants.**

---

**(Captions continued on next page.)**

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**DARKOWL, LLC, et al.,**
**Defendants.**

**CIVIL ACTION NUMBER: 24-cv-10600**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**SPY DIALER, INC., et al.,**
**Defendants.**

**CIVIL ACTION NUMBER: 24-cv-11023**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**INNOVATIVE WEB SOLUTIONS, LLC, et al.,**
**Defendants.**

**CIVIL ACTION NUMBER: 25-cv-1535**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**PUBLICNSA, LLC, et al.,**
**Defendants.**

**CIVIL ACTION NUMBER: 25-cv-5989**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**REDX LLC, et al.,**
**Defendants.**

**CIVIL ACTION NUMBER: 25-cv-6863**

---

**(Captions continued on next page.)**

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**FREEDOMSOFT303, LLC, et al.,**
**Defendants.**

**CIVIL ACTION NUMBER: 25-cv-9224**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**STERLING DATA COMPANY LLC, et al.,**
**Defendants.**

**CIVIL ACTION NUMBER: 25-cv-9963**

---

**ATLAS DATA PRIVACY CORPORATION, et al.,**
**Plaintiffs,**
**vs.**
**AGR MARKETING SOLUTIONS, LLC, et al.,**
**Defendants.**

**CIVIL ACTION NUMBER: 25-cv-12137**

---

**A P P E A R A N C E S:**

BOIES SCHILLER FLEXNER LLP
BY: ADAM R. SHAW, ESQUIRE
30 South Pearl Street, 12th Floor
Albany, NY 12207
For the Plaintiffs

PEM LAW LLP
BY: RAJIV D. PARIKH, ESQUIRE
1 Boland Drive, Suite 101
West Orange, NJ 07052
For the Plaintiffs

PORZIO BROMBERG & NEWMAN, P.C.
BY: ALFRED R. BRUNETTI, ESQUIRE
100 Southgate Parkway
P.O. Box 1997
Morristown, NJ 07962-1997
For the Plaintiffs

**A P P E A R A N C E S:** **(Continued)**

TROUTMAN PEPPER HAMILTON SANDERS LLP
BY: ANGELO A. STIO, III, ESQUIRE
MELISSA A. CHUDEREWICZ, ESQUIRE
301 Carnegie Center, Suite 400
Princeton, NJ 08543
For the Defendants Innovis Data Solutions; DM Group; PropertyRadar; Deluxe Corp.; RocketReach

GREENSPOON MARDER
BY: KELLY MAGNUS PURCARO, ESQUIRE
1037 Raymond Blvd., Suite 900
Newark, NJ 07102
For the Defendants Joy Rockwell Enterprises; DarkOwl; Searchbug; US Data Corp.; Accuzip; The Alesco Group; Amerilist; AGR Marketing; REDX

CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
BY: JOHN E. MACDONALD, ESQUIRE
2029 Century Park East, Suite 1100
Los Angeles, CA 90067
For the Defendants Freedomsoft303; Accurate Append; Restoration of America

RKW, LLC
BY: H. MARK STICHEL, ESQUIRE
10075 Red Run Boulevard, Suite 401
Owings Mills, MD 21117
For the Defendant eMerges.com, Inc.

FBT GIBBONS, LLP
BY: JOSHUA ELIAS, ESQUIRE
One Gateway Center
Newark, NJ 07102
For the Defendant Equimine, Inc.

BUCHANAN INGERSOLL & ROONEY, P.C.
BY: KRISTA ANN ROSE, ESQUIRE
50 South 16th Street, Suite 3200
Philadelphia, PA 19102
For the Defendant Zillow

BALLARD SPAHR, LLP
BY: MARCEL PRATT, ESQUIRE
1735 Market Street, 51st Floor
Philadelphia, PA 19103
For the Defendants West Publishing; TREC

**A P P E A R A N C E S: (Continued)**

RIKER DANZIG, LLP
BY: OMAR MAROUF, ESQUIRE
One Speedwell Avenue
Morristown, NJ 07962
For the Defendant Melissa Data Corp.

LOMURRO LAW
BY: HANNAH SCIONTI, ESQUIRE
4 Paragon Way, Suite 100
Freehold, NJ 07728
For the Defendants Scalable Commerce; National Data Analytics; Digital Safety Products; Civil Data Research

WOOD, SMITH, HENNING & BERMAN
BY: JARED K. LEVY, ESQUIRE
5 Waller Avenue, Suite 200
White Plains, NY 10601
For the Defendants Compact Information Systems; Accudata; AlumniFinder; ASL Marketing; College Bound Selection Service; DeepSync Labs; HomeData; Student Research Group

MANATT, PHELPS & PHILLIPS, LLP
BY: EMILY WHITELY, ESQUIRE
7 Times Square
New York, NY 10036
For the Defendants Smarty, LLC

LEWIS BRISBOIS BISGAARD & SMITH LLP
BY: BRIAN DEENEY, ESQUIRE
One Riverfront Plaza, Suite 800
Newark, NJ 07102
For the Defendant Synaptix

GORDON REES SCULLY MANSUKHANI
BY: REBECCA R. MCCUSKER, ESQUIRE
Three Logan Square, 1717 Arch Street, Suite 610
Philadelphia, PA 19103
For the Defendant Quantarium Alliance; Innovative Web Solutions; Nuwber

STINSON LLP
BY: RICARD J.L. LOMUSCIO, ESQUIRE
100 Wall Street, Suite 201
New York, NY 10005
For the Defendant i360

**A P P E A R A N C E S:** **(Continued)**

MULLEN COUGHLIN
BY: JORDAN O'DONNELL, ESQUIRE
426 Lancaster Avenue, Suite 200
Devon, PA 19333
For the Defendant PublicNSA

REED SMITH LLP
BY: DAVID G. MURPHY, ESQUIRE
506 Carnegie Center, Suite 300
Princeton, NJ 08540
For the Defendant Sterling Data Company

WADE CLARK MULCAHY LLP
BY: CAROLINE NELSON, ESQUIRE
1515 Market Street, Suite 2050
Philadelphia, PA 19102
For the Defendant Delvepoint

COOPER, LLC
BY: RYAN JOHN COOPER, ESQUIRE
108 N. Union Avenue, Suite 4
Cranford, NJ 07016
For the Defendant Labels & Lists, Inc.

KAUFMAN DOLOWICH LLP
BY: TIMOTHY MARK ORTOLANI, ESQUIRE
Court Plaza North
25 Main Street, Suite 500
Hackensack, NJ 07601
For the Defendant Spy Dialer

**Intervenor:**

NEW JERSEY OFFICE OF THE ATTORNEY GENERAL - DIVISION OF LAW
BY: KATHLEEN RILEY, DEPUTY ATTORNEY GENERAL
124 Halsey Street, 5th Floor
Newark, NJ 07101
For the Intervenor, Attorney General of New Jersey

**Also Present:**

Scott Christie, Esquire, McCarter & English, LLP
Ivannya Fitzgerald, The Courtroom Deputy

**INDEX**

**ARGUMENT**


| ATTORNEYS: | PAGE |
|---|---|
| Mr. Parikh | 15, 22, 31, 49, 53, 59, 61, 64, 65, 66 |
| Mr. Stio | 17, 28, 35, 52, 54, 61, 63, 64, 65 |
| Mr. Shaw | 27, 35, 45 |
| Ms. Purcaro | 38 |
| Mr. Christie | 46 |
| Mr. Pratt | 56 |
| Ms. McCusker | 67 |

(PROCEEDINGS held in open court before The Honorable Harvey Bartle, III, United States District Judge, at 10:01 a.m. as follows:)

THE COURTROOM DEPUTY: All rise.

THE COURT: Good morning. You may be seated.

MR. SHAW: Good morning, Your Honor.

THE COURT: These matters have a lot of moving parts, and I thought before we get into where we go from here I just kind of review where we are at the moment and what seems to be still outstanding.

Well, on Friday I decided all but one of the motions to dismiss the counterclaims, if there is a motion still pending in Atlas v. Labels & Lists, 24-4172, according to my records.

The Atlas v. Kleissner, K-L-E-I-S-S-N-E-R, 25-17065, still has a motion to dismiss for lack of personal jurisdiction, discovery is ongoing. And the briefing in that matter should be concluded by the middle of August.

In Atlas v. True Software, 25-7650, there's plaintiff's supplemental brief is due tomorrow in that case.

MR. PARIKH: That's right, Your Honor. We actually submitted a letter I think yesterday.

THE COURT: Well, whatever. I haven't -- you did it over the weekend?

MR. PARIKH: Yeah.

THE COURT: I haven't seen it yet this morning. Very good.

And I understand all the confidentiality orders have been signed and that's all taken care of?

MR. PARIKH: That is, Your Honor.

THE COURT: And I assume the New Jersey Supreme Court hasn't spoken as of this morning?

MR. PARIKH: As of this morning we don't know when that opinion will be issued.

THE COURT: Thank you.

All right, anything further on what's pending before we get to any status issues?

MR. PARIKH: Nothing else, Judge.

THE COURT: All right.

The main purpose of this get-together this morning was to talk about where we go from here. I was hoping that counsel will have a chance to confer. We're at the point now where we need to move forward with discovery and ultimate trial of these cases. Obviously, we can't do 40 at one time. And I'm happy to hear what counsel has to say on the subject of moving forward.

Mr. Parikh.

MR. PARIKH: Thank you, Your Honor. Nice to see you. Raj Parikh on behalf of plaintiffs.

THE COURT: Thank you.

MR. PARIKH: Your Honor, we did have a chance to meet and confer again with defense counsel. There's still some deficiencies with respect to Rule 26 disclosures. We talked about some of those things. From a bellwether perspective of what Your Honor had raised from the order, I think from plaintiff's perspective we're happy to consider that. We think that may be an efficient way to proceed. I think defendants may have a different idea. But in terms of discovery, we spent a lot of time going back and forth on Rule 26 disclosures. I think from our perspective we can continue to work through that while we move discovery forward.

THE COURT: All right.

MR. PARIKH: We're open to whatever Your Honor wants to suggest in terms of the pathway forward. One idea that we had was potentially that the parties meet and confer over the next month, come up with a Rule 16 plan, if it's going to be for, you know, one grouping of bellwether cases, for example, we could do it that way. If it's for all of the cases, we do discovery and then we can --

THE COURT: Well, that's the question, whether we move forward with discovery in 40 cases, which is a lot of discovery, or whether we should move forward with a selected number of cases, tee those up and move them toward trial.

MR. PARIKH: I think from our perspective, Your Honor, moving forward with a group of selected cases and teeing

up for trial makes the most sense. It's the most efficient. It will allow for adjudication of legal issues based off of a record. And we would -- we believe that that would be the most appropriate and efficient way to move forward.

THE COURT: Mr. Stio.

MR. STIO: Good morning, Your Honor.

THE COURT: Good morning.

MR. STIO: Your Honor, I think that the bellwether idea would prejudice defendants. It would make it much more costly for defendants and here's the reasons why. One, what you would essentially be doing is put a bunch of cases on hold. Those defendants would still need to make sure they're reviewing all the pleadings, attending motions, perhaps intervening so that rulings aren't made without consideration of their facts if you're going to try to apply them across the board.

Two, by making defendant stop, employees leave, memories fade. And while Atlas is going to attempt to build one record and just give it to everyone, the defendants who are not part of that bellwether will be prejudiced because they're going to have to wait a long time before they're going to be able to build a record. Employees may not be around, memories could fade, and it's just not fair to them.

THE COURT: Well, how is that different than an MDL? I know this is not an MDL, but an MDL like this group of cases

involves many cases and you can't try them all at once. So the device used in the MDL is to pick out several cases and try them. And who knows, in that situation memories fade, employees leave. You don't continue with discovery on -- individual discovery anyway -- on hundreds or thousands of cases.

MR. STIO: Right. But here, this is not an MDL and you have acknowledged that.

THE COURT: I understand it's not, but --

MR. STIO: And there's no single defendant, right?

THE COURT: That's true.

MR. STIO: So the defendants are prejudiced because they're essentially being asked to defend themselves years later when a discovery record could be built all at the same time. And if the Court wants to pick out after a discovery record is built what case will go first to trial, I don't think that -- I think you have -- first of all, I think you have the authority to do that and the discretion, but I don't think that that would result in as much prejudice as, all right, these two are going to go forward, the rest of you 38 we'll get to you in, you know, two to three years. I mean, it's just not fair to the defendants. They still have to monitor that and spend money, and they can't build their own record. I would caution the Court on doing that.

THE COURT: So what would you propose?

MR. STIO: So as the next steps, Your Honor, I don't believe that there are deficiencies with disclosures, but we're willing to meet and confer on that. We're willing to meet and confer to come up with a joint discovery plan. But I do think that these are individual cases and there are different defendants in every single case.

THE COURT: Correct.

MR. STIO: They should proceed with discovery pursuant to a joint discovery plan that the Court --

THE COURT: Just give me an outline how that would work. So there are, let's just round it off, 40 cases.

MR. STIO: Mm-hmm.

THE COURT: So tell me what you think how that would progress if we have -- if the plaintiffs would notice the depositions of -- the 30(b)(6) depositions of all the defendants, right?

MR. STIO: Correct.

THE COURT: And they take them one at a time. That's going to take --

MR. STIO: Right.

THE COURT: And then you do what? And then you would all seek to depose the key people at Atlas?

MR. STIO: The people at Atlas with relevant information. Our clients would, to the extent there's different circumstances, have the ability to ask questions

particular to them. We'd work together to try to do joint discovery, but there's going to be individualized issues where maybe it's 25 document requests and then ten supplemental ones. But we could work that out through the joint plan that we propose. But I don't think that, you know, there's going to be a one-size-fits-all plan. I think there is going to be individual plans based on the defendant's needs.

And while the Court can set deadlines consistent for fact discovery, expert discovery, disclosure of witnesses, I think that --

THE COURT: That would result, of course, in significant delay, wouldn't it? I think if we were to -- if we have discovery of the key witnesses of all the defendants at least, the plaintiffs have to do that.

MR. STIO: Correct.

THE COURT: That's 40, 40 depositions.

MR. STIO: Correct.

THE COURT: At least.

MR. STIO: Yes.

THE COURT: So we go forward with the 40 depositions and then your client would maybe -- let's say there are one or two key Atlas employees, just to pick a number for a moment. So then there would be 40 -- or would we have just one deposition and we'd have 40 defense counsel sitting around and asking questions? How would you foresee that happening?

MR. STIO: Your Honor, they filed these as individual cases. They're the plaintiffs, right?

THE COURT: I understand.

MR. STIO: This is the courthouse or the playing field they've developed.

THE COURT: Right.

MR. STIO: And I think that due process requires the defendants to be able to take the deposition --

THE COURT: Well, I don't disagree with that.

MR. STIO: -- together to try to have maybe standard questions and then individual questions by the defendants that are unique to them. And the way I see it is we would figure out who has individual questions and come up with a plan for the Court. So I don't see them producing one person 40 different times. But I do see them producing one person. It's going to be longer than seven hours.

THE COURT: Absolutely.

MR. STIO: Yeah, yeah. But what I'm trying to avoid, Your Honor, is I'm defendant number 39 of the 40. I'm not getting to Court under the bellwether for ten years. That's a delay for me. And I don't think that's a reasonable delay. Where, let's build a record, you could have it locked in, and then if you want to try it. Or if you could eliminate some with summary judgment, which we think is going to happen in a number of these, they get knocked out. To make someone just

sit on the sideline and continue to incur legal fees monitoring the case I don't think is fair to defendants.

THE COURT: Mr. Parikh, what about that?

MR. PARIKH: So, Your Honor, I think Your Honor is right to compare this to an MDL. I think even Mr. Stio, I think, the first time we were here said this is a reverse MDL. And, you know, defendants are often -- you know, they don't want to have bellwethers and all kinds of MDLs because of control and other things like that.

I'll also say that the defendants have filed, I think, at least three different motions to stay these cases at certain points in time, so the whole idea of, like, delay now is, to me, it seems convenient to them. And I think from our perspective it is the most efficient way to proceed, is to have a group of cases that can be bellwether cases that can move forward.

The legal issues here, which the defendants have talked about from the first time we were before Your Honor, it will allow us to build the record and coalesce around those kind of central core legal issues. For example, they claim that the nondisclosure requests were not actually sent by covered persons, that they were sent by Atlas, right? And that becomes one issue that any type of bellwether case and discovery into that will be able to determine.

The same token, how it is and what it is, you know,

the Court or a jury decides is a disclosure under Daniel's Law, how those damages are calculated. These are all central core legal issues that can be developed through a grouping of bellwether cases that will help and assist the Court in shaping all 40 cases and can happen on a fast track, within a year, frankly, now that we've got a lot of the preliminary motions and other things out of the way.

So by picking out a smaller grouping of those cases, allowing discovery to push forward full bore -- the defendants have been coordinating through a joint discovery group, not just with the federal court defendants, but with all of the defendants across all 180-plus cases for two years. I'm confident that with Mr. Stio's leadership and other people that have taken leadership roles that they can accomplish what they need to while protecting interests of clients, and allow the cases to proceed efficiently to benefit everybody, not just the plaintiffs here and the covered persons, but also the other defendants.

THE COURT: I'm just throwing this out, what about a hybrid? For example, if the defendants had an opportunity to take the depositions of the Atlas people, 30(b)(6) or whatever type of depositions they wanted to take, and we scheduled those so that everybody would have the information with respect to the plaintiffs. And that's pretty -- be pretty common. We could do that, give everybody an opportunity to do it. And

then, of course, the discovery with respect to the individual defendants is going to be different. And whether -- I mean, whether that's a possibility if they're worried about not being able to ask your people questions and so forth early on, so they have that. And it may weed out a lot of cases too as a result.

MR. PARIKH: It may, Your Honor. I think the problem with that is that, for example, right, to the extent a grouping of defendants asks someone from Atlas, okay, what is your evidence of noncompliance for defendant A versus B versus C.

THE COURT: I see, yeah.

MR. PARIKH: Those are really defendant-specific things. If it's about -- if it's depositions related to how covered persons signed up for Atlas, how they transmitted their nondisclosure requests, you know, how the system functions, et cetera, then, of course, I think that could be handled through a bellwether deposition as well. Those are the common questions ultimately that --

THE COURT: But the question, though, in a bellwether, only the defendants who were involved in the bellwether would be participating in the depositions. But if we maybe had a system where the second group of questions were open to defendants in all 40 cases, I mean, sort of awkward, but maybe --

MR. PARIKH: Yeah, I think, and as Mr. Shaw was just

telling me, Your Honor, this is similar to what we did on the jurisdictional discovery --

THE COURT: Right.

MR. PARIKH: -- with respect to Atlas and whether it was a Delaware corporation, et cetera. That is what happened, it was across all of the defendants that had filed motions to dismiss, or rather, where there was a motion to remand pending with respect to diversity jurisdiction.

THE COURT: Right.

MR. PARIKH: And we took one deposition for seven hours of the Atlas corporate representative where I think two or three lawyers took the lead, and then later on a couple of other lawyers asked follow-up questions with respect to that. Even though for each defendant that issue of diversity jurisdiction and CAFA was different in terms of some of the arguments they're making.

So we think there's -- I agree with Your Honor that there's a way to do that within a bellwether system to allow defendants to do that. My only caution would be that for defendant-specific questions that relate to discovery that plaintiffs would get from that defendant, we would not have a witness prepared at that point since we wouldn't have engaged in document discovery with that particular defendant.

THE COURT: Right.

Mr. Stio.

MR. STIO: Your Honor, just, the hybrid might work. I think I heard from Mr. Parikh that, well, the evidence of noncompliance is in the defendant's custody. They filed a complaint and they had to have evidence that there was a violation. What they can't say is, hey, we're going to want a fishing expedition for information. We have been trying to get the evidence of noncompliance, including evidence related to representations that they have made that you continue to not comply. They won't tell us the systems --

THE COURT: Of course that's going to vary from defendant to defendant.

MR. STIO: It will.

THE COURT: Some, they may say that they have complied now, others though continuing not to comply.

MR. STIO: But if I'm defendant number 39.

THE COURT: Right.

MR. STIO: And I comply, and they don't have any evidence of it, but I have to continue to sit around for ten years until you get to my number, that's a lot of money to have to spend when they're not showing their cards. And that's a real issue. I mean, we raised it early on in the motion to dismiss and we respect the Court's decision. But at some point, you know, like, they're going to ask for discovery, right, and their discovery is give us all your databases. No. There has to have been a violation. What databases did you see

information publicly disclosed? And in fact, if the information is publicly disclosed, presumably Atlas and every single one of the assignors who claim they had a claim at the time of assignment, in order to have a claim they had to have seen a disclosure after the ten-day period. They don't want to go down that path because they don't have evidence of nondisclosures as to every defendant. And defendants should not have to sit around to wait for their turn to move for summary judgment when they believe they have a viable defense.

THE COURT: Mr. Shaw.

MR. SHAW: Your Honor, excuse me, Adam Shaw for the plaintiffs.

This issue about their systems doesn't really -- it rings hollow. If we were to issue a request for production or an interrogatory about their systems, he doesn't get to say we have to prove our case first before we can determine what's relevant information. I mean, it has to touch on the issues in this case. So I'm trying to -- I call it hiding their systems. But even if they just say that they don't want to disclose it, that's really a non-starter, because if we issue discovery we'd get it. Eventually, we are going to get that information anyway. We have been trying to work our way through it in a way that's reasonable and efficient, they have been not wanting to give it.

But otherwise, I would just be echoing what

Mr. Parikh said about the hybrid system. I think it could work. We've done it, an example of it, already in this case. But I think what Mr. Parikh was saying is there are certain things that are defendant-specific that would be, you know, burdensome in a deposition of Atlas or for Atlas to produce where you would essentially be doing your 40 cases at the same time. But that could be worked out through a Court case management order before a deposition or something like that. Those are -- those are the tail wagging the dog. I think some form of an MDL-type bellwether makes the most sense for efficiency here. If Mr. Stio is worried about being number 39, that client --

THE COURT: Make him number one.

MR. SHAW: Exactly. They could raise their hand. Exactly, that's my point. So he's echoing things that happen all the time in MDLs with bellwethers. If you follow his course there would never be a bellwether. There's always some other defendants who are waiting for something else to happen in a case. But Your Honor could protect those, protect their due process rights, that happens all the time.

MR. STIO: Your Honor.

THE COURT: Right.

MR. STIO: There are not some other defendants in other cases that are subject to bellwethers in MDL because this isn't an MDL, there's all different defendants. The New Jersey

Supreme Court denied their application to create a multi-county litigation, which is the equivalent of the federal MDL.

THE COURT: Right.

MR. STIO: And the reason, there's due process issues with that, okay. This is not a situation where there's one common defendant and one common issue, right? You have a product, you have a policy, one defendant --

THE COURT: Of course, the MDL you do have plaintiffs that may have to wait for years. They're the ones who want to recover damages who may be seriously injured by a product. In an MDL, they have to wait until the bellwether is tried, plaintiffs that aren't subject to the bellwether, don't they?

MR. STIO: The plaintiffs here --

THE COURT: No, I'm talking about in a bellwether.

MR. STIO: Yeah.

THE COURT: The plaintiffs have to wait maybe for years.

MR. STIO: Yeah.

THE COURT: While the bellwether is tried, the other plaintiffs, the ones that have been seriously injured by the product don't have any redress maybe for years while the bellwethers are being tried.

MR. STIO: Right. That plaintiff, though, has their medical records, that plaintiff is a single person who is not going to, absent, you know, death, is not going to leave their

employment --

THE COURT: No, a lot of plaintiffs in MDLs that unfortunately go on to their reward before the bellwether's finished.

MR. STIO: Right. But our issue isn't reward, our issue is we're corporations, we have different policies, we have different procedures, employees leave, memories fade, and we're going to have to be involved to make sure that any discovery rulings are not going to be applied across the board without having our input.

In addition, they're going to have a 30(b)(6), right, for two cases. Am I going to be able to then take that person's deposition or are you going to impose a burden on me which is, well, Mr. Stio, read the entire transcript and you could only ask questions that were not already asked. Again, that's not fair because I'm not there in realtime to ask followups.

I just don't think where you have so many different defendants an MDL or a bellwether works. Let's get the discovery record created, get it locked in, and then if you want to pick the cases to go to trial, that's fine. But I don't think what they're proposing is to put people on the sideline, let us cherry pick the best cases, and then, you know, ten years down the road we'll get all these done. That's a real delay.

THE COURT: Let me ask Mr. Parikh.

Let's assuming hypothetically you pick a case, how long is going to take in terms of discovery? Now, I know each case may be a little different, but you do have the initial disclosure.

MR. PARIKH: You do.

THE COURT: We have the confidentiality order signed.

MR. PARIKH: Mm-hmm.

THE COURT: So what has to be done? What -- just tell me how you go about an individual case?

MR. PARIKH: I think, Your Honor --

THE COURT: What are you going to need?

MR. PARIKH: To answer the first part of the question, I would say nine months, six months, nine months, maybe a year.

THE COURT: A year?

MR. PARIKH: Yeah, I don't even think it would take that long. I think it depends on how much resistance there would be from the defendant. So I think the core components here in terms of document discovery are understanding what type of data the defendant has, whether they have a database or system, what covered person's information is within that database or system, and what suppression methods they used and how that failed. So that's kind of one piece of it.

THE COURT: Now, you would obtain that information

through document production or --

MR. PARIKH: Or an inspection. We have, in other cases, we have had an expert inspection where an expert has gone in, looked at an email system for a defendant who claimed, for example, they did never receive any nondisclosure requests. And we did, I think, a series of four one-hour document, you know, kind of computer system inspections virtually to look at things. In that case also they produced some records to us so we could essentially parse out how many covered persons and home address information they had in their system at a given point in time. And so that was the way that we did that.

Similar efforts could be done here either through inspections through getting -- and we had this conversation just on Friday about getting a data map from the defendants, we understand where they have different pieces of information so that we can then, you know, attack the heart of the issue, which is, was the defendant negligent in not complying with the Daniel's Law request that they received or not. So I think that's one bucket of discovery.

Another would be email system and document management system related discovery, policies and procedures that the defendant may have in place in terms of, you know, how to comply with privacy laws, including Daniel's Law, whether they knew about Daniel's Law or not, a lot of that will get taken care of through some document discovery, looking at email

records and whatnot, and then through depositions. And then, and then --

THE COURT: Tell me about the depositions, they would be 30(b)(6) primarily?

MR. PARIKH: I think primarily, Your Honor. There may, depending on the defendant, we may have to take, for example, the deposition if they have a compliance officer that's responsible for all compliance programs who we need to ask questions about what the policies and procedures were, whether they knew about Daniel's Law or not, why it is that their system failed, what it is that, you know, depending on what affirmative defenses they're raising, when the nondisclosure requests were received, what occurred or what didn't occur, you know, what their internal mechanisms were, et cetera. So there may be some other depositions depending on the defendant.

In some cases there are defendants who claim that they never received the nondisclosure requests at all. So in those cases there may be an additional, you know, 30(b)(6) deposition or the deposition of someone involved with their IT infrastructure or their email system to figure out how it got routed to spam, for example, and whether someone was checking that spam box or not.

And then I think the final component, Your Honor, with respect to discovery from defendants to the plaintiffs is

disclosures, right? So what is the method of access that people have, whether they have direct-to-consumer disclosures, business-to-business disclosures, if they have an automated interface where people can pull millions of records, you know, every single day or whether people have to buy a single report, whether they have a website that you can search and get things for free and what trackings they have. So I think that's kind of the final piece.

And then I think from plaintiffs' side to the defendants, they want to understand who -- how the assignors signed up for the services, what it is that the assignors did, how the nondisclosure requests were sent. A lot of the discovery that we have we've already produced in terms of every terms of service that was executed, every nondisclosure request in terms of the dates and everything that was sent. So from our perspective, you know, there's buckets of discovery that we would be producing to the defendants. I'm sure they'll ask more additional things, that we may have some discovery fights. But that's why I say, you know, six months, nine months maybe depending on how many fights there are depending on the defendant. But not ten years. I mean, I would think we could have a trial in 2027.

THE COURT: Certainly not ten years --

MR. PARIKH: I'm sorry, Your Honor?

THE COURT: It will not be ten years if I have

anything to say about it.

MR. PARIKH: No, absolutely not, Your Honor.

MR. STIO: May I just say one thing, Your Honor?

THE COURT: Let me hear from Mr. Shaw, then I'll hear from you.

MR. SHAW: Sorry. Mr. Shaw.

I think if your instinct at the beginning, the question was, you know, what's the size of this case; they're relatively small cases. These are not multi defendant conspiracies that occur over years when you have to get permission to get more than ten depositions. I would think, you know, it's a small case, five depositions, five to seven, you know, it's contained. And trial would be a few days. I mean, it's not -- in your world this is not a very large case.

THE COURT: Mr. Stio.

By the way, I'm going to hear from other counsel too.

MR. STIO: Look, an MDL doesn't work. But if you're on the MDL train, MDLs also do sequency. And why don't we do a first step where they serve their initial interrogatories and initial document requests, defendants serve their initial interrogatories and document requests, and we respond by objecting and identifying the objections or stating what we can intend to produce. We don't produce anything but we get the objections. We then group those --

THE COURT: Well, I hope that is the attitude. I

think the attitude ought to be we try to answer the interrogatories and requests for production. The idea that we start out we're going to object is just not the approach that I --

MR. STIO: Well, I say this because it happened, it happened in state court already. You know, they claim that they produced everything. They didn't. They don't produce a single document from any individual plaintiff. They don't produce a single document showing evidence of a violation. We've asked for information, communications with all the assignors, updates. Zero.

They've given us automated documents that Atlas has cherry picked, and most them are duplicative. It doesn't tell us how the system works, how the system that they use functions, whether there were bounce backs received by the system, what communications the assignors had with respect to the timing of when these requests were sent. How all of a sudden 19,000 people during the holiday season decided to hit send in unison on the same evening at 1 o'clock in the morning, you know, those are things that we're entitled to get. And I'm not saying that we're all going to object, there are things that we can produce.

THE COURT: Right.

MR. STIO: But I can tell you that in large part there are going to be motions to compel or motions for

protective order in every single one of these cases.

So what we can do is, deal with the objections up front so that those are locked in. You provide guidance that gets us to what has to be produced, gets us to summary judgment motions. But defendants aren't waiting around.

THE COURT: See, the problem is, Mr. Stio, if we go forward with discovery in 40 cases, and it seems to me you have just made an argument as to why that should not be done, if we're going to have motions to compel and objections in 40 cases going on simultaneously, that's an impossibility. How can that -- the system is going to just totally break down.

MR. STIO: What I'm saying --

THE COURT: Then we won't get to trial for ten years in any of the cases. If that's going to be the pattern that you're outlining here, then that, it seems to me, is strong argument for picking a couple cases, let's get going and see what happens.

MR. STIO: But there are -- what I'm trying to say is, by doing --

THE COURT: You're going to need a full time discovery court here just to deal with the objections and so forth.

MR. STIO: But we can try to group the objections if they're similar across cases.

THE COURT: Well, all right. Let me hear from other

counsel.

Ms. Purcaro, you seem to be anxious to speak.

MS. PURCARO: Good morning, Your Honor.

THE COURT: Good morning. And pull the microphone toward you some. Thank you.

MS. PURCARO: Kelly Purcaro, from Greenspoon and Marder, on behalf of a number of defendants.

I did not want to speak, but I felt compelled to do so just to kind of impress upon the Court the process that's ahead of us in terms of discovery for the covered persons as well.

And so, in some cases there's around 19,000 covered persons that Atlas is bringing claims on behalf of. Some there's about 20,000. The named plaintiffs are different from case to case.

THE COURT: Correct.

MS. PURCARO: We have received one set of initial disclosures. That means every named plaintiff for all cases, even if they're not all named here with footnotes. So it has not been individualized. However, I have a concern about the covered persons confidential information and how we're going to deal with that going forward. So if there's about a 20,000-person max and maybe a thousand or 2,000 have information that's in some cases but not in other cases, are we sharing those folks' information all throughout all of the

defendants or is there going to be an argument that it's confidential/protected information and only if it's persons that are in that case and they deal with that information for those particular people.

There's, as a threshold matter, whether or not there's 19,000 or 20,000 covered persons is an issue that has to be dealt with. Not everyone is saying I'm a covered person because I am an officer of the Court, I'm a police officer. Some are saying they are relatives. Are they immediate relatives? Do they live there? Then there's the issue of the covered information which varies. So this is not a class action and you can't have a representative action with the absent members not giving information about their individual claims.

As I stand here right now, I don't know if my clients have 20,000 potential violations, 40, 60, 50, I have no idea. And also, every defendant is not created equal. There are many defendants that don't consider themselves to be data brokers, right? There are defendants that are people search, that are not people search, that are list providers. There's post card senders. There's folks that don't give access to information to the public at all. There's people that give access that are dealing with government contracts that have different restrictions on the information that they can disclose, and to whom. So having that shared broadly would be difficult.

So there are a lot of nuances per case that -- I think me, listen, I don't want to try all these cases for the next ten years either, but I think there's a way to move forward on a discovery plan that first finds information that everyone is going to need from everyone. And maybe we have someone to deal with how we get to that information exchange in a way that's agreeable. And then when individual issues come up, how do we deal with the information that's individual to each defendant so that that information can get out there.

Now, there were motions to dismiss, for example, early on in the Communications Decency Act. And it was denied as premature because you need discovery to figure out what the information is, who's publishing it, who's creating it, are they processing it, changing it, all that information.

Similarly, there was discussion early on about as-applied challenges to Daniel's Law as applied to certain defendants. But again, we can't get to those arguments in advance of discovery because we have to know what happened with respect to each defendant and whether Daniel's Law as applied to that defendant is constitutional.

And so to kind of put a pin on all discovery and put all these things on hold I think will have the impact of denying due process, quite honestly, to a lot of defendants, but also delaying --

THE COURT: I'm a little surprised by that argument

because early on you and your colleagues all wanted me to stay all these cases until the Court of Appeals or the Supreme Court decided on the constitutionality. Now, all of a sudden, you want to speed it up.

MS. PURCARO: No.

THE COURT: So which is it?

MS. PURCARO: I would prefer a stay, absolutely, until there's a decision from the Supreme Court and the Third Circuit because I think to hone down, for example, negligence per defendant for what -- if that may or may not --

THE COURT: Yeah, but during that period employees may leave and they may die and memories fade, don't they? But yet, you wanted the stay early on. And now you're telling me you still want a stay waiting for the U.S. Supreme Court to decide.

MS. PURCARO: Yes. But in the event Your Honor wants to proceed with discovery, I don't want to proceed in a way that it only focuses on some information and doesn't allow all defendants to participate in discovery. And in terms of how long it will take, I don't know if we're going to pick cases with 19,000, 20,000, how many covered persons.

THE COURT: Well, they all have 19 or 20, don't they?

MS. PURCARO: I'm sorry?

THE COURT: I said all the cases have 19 or 20,000 covered persons.

MS. PURCARO: Yes, so that's a thousand person swing, and is that information going to be -- is it going to be the most inclusive case with the most people and the most information? And then we are going to find out whether each person covered is actually a covered person and whether or not the information they sent --

THE COURT: So, in other words, you're proposing discovery with respect to all 19,000 people? And you were going -- you would depose all 19,000 covered persons to see whether they actually were a police officer in Camden or in Gloucester or in Bergen County?

MS. PURCARO: Or a relative of and whether their phone number was published or unpublished.

THE COURT: Whether it's an ex-wife or the present wife?

MS. PURCARO: I think that the defendants have a right to defend the case brought against them for sure and to know whether or not the information --

THE COURT: So this is going to take a hundred years.

MS. PURCARO: But that's the case that was filed.

THE COURT: I understand.

MS. PURCARO: And it's how it was filed by the plaintiff. So, you know, whether or not information was covered information is an element that will have to be shown more likely than not by the plaintiff before you can charge

someone for violating a law if the information, even if it was disclosed, if it wasn't covered under the law. We have --

THE COURT: Of course --

MS. PURCARO: -- that submitted five different addresses to not be disclosed. Are they all home addresses?

THE COURT: If you violated as to one covered person, that's a violation; isn't it?

MS. PURCARO: If you violated?

THE COURT: As to one person.

MS. PURCARO: As to one person.

THE COURT: That there's a violation?

MS. PURCARO: Maybe one, maybe more, maybe none if it's not covered information.

THE COURT: I understand. But for a violation to occur, there has to be one covered person whose information was not eliminated from disclosure within ten days. That would be a violation. I mean, assuming that we don't have an issue of negligence and so forth.

MS. PURCARO: Well, under the law as it is right now, which is on appeal, is that negligence is an element of Daniel's Law.

THE COURT: Right.

MS. PURCARO: So it would have to be that the person is a covered person, that they made the request, that they made the request for actually covered information, that their

request was received, that their request was not complied with in ten days, and it wasn't complied with within ten days due to negligence.

THE COURT: Right.

MS. PURCARO: And that inquiry has to happen for each of the 19 or 20,000 people.

THE COURT: So what do you propose? You think it would expedite things to have all the discovery at once or to do it one or two cases as bellwethers?

MS. PURCARO: I would propose what was proposed originally, that the parties continue to work on resolving any deficiencies in terms of the initial disclosures and meet and confer with respect to a proposed discovery plan and have a Rule 16 where we can try to identify issues that can be dealt with across the board first and then individual issues can be dealt with through discovery in different phases going forward. But I think it's premature to say bellwether at this point because we don't even know the baseline information, for example, to say, okay, we're going to pick five different types of defendants with different types of issues, right? We don't even know which defendant is which defendant yet or whether their defense is, you know, supported by evidence of we didn't disclose, we have Communications Decency Act, it doesn't apply to me, like, those other things need to be resolved first. And I think we can do it in buckets of issues so that when it is

trial time it's only those cases that need to be tried and only those covered people or only those issues that need to be tried, and folks that don't need to go to trial don't have to sit around and wait.

THE COURT: All right.

Mr. Shaw, you wish to comment?

MR. SHAW: Adam Shaw for the plaintiffs.

Your Honor, I want to take a step back for a second. You have an issue in front of you. You have to figure out how to go forward here. And we're trying to figure out the best way to do that. We have to take a look at rule one, what's the efficient way to get through this. I thought that Mr. -- that counsel on the other side here recognized that Your Honor has the ability to control the course of the discovery and kind of control the course of these cases. We think you have that ability. We think the best way to do that is to go forward through either a pure bellwether type situation or some hybrid.

The issues that Ms. Purcaro is raising seem to be -- I think some of them are just wrong. She wants to know, for example, the status of covered persons, whether they were spouses or actual, you know, retired people. I think we gave that to her. We gave that to her. She has all of that.

The idea that she's going to depose 19,000 people. I don't think anybody has raised that. That seems to be -- what are they going to ask 19,000 people? If she wants to know what

a particular -- I mean, we're the assigned -- we've got the assignments, we have information about people, we're able to give that to them, we've already done that. There's no reason to take a deposition of 19,000 people.

I think what they're asking for is kind of chaos, really. And I think Your Honor can set up ways to get through this and get the information to them that they need in an orderly fashion. And some of the things that she's raising, frankly, are things either that we've already worked through or we can work through on discovery. But taking the deposition of 19,000 people, you know, doesn't make sense.

THE COURT: Anyone else wish to be heard? Everybody else is happy whatever we do?

MR. CHRISTIE: May I approach?

THE COURT: Good morning.

MR. CHRISTIE: Good morning, Your Honor. Scott Christie, McCarter & English. I do not have a case presently before the Court, I have two defendants who are in state court. May I just approach and discuss the issue with you based on that perspective?

THE COURT: Sure.

Any objection?

MR. PARIKH: No objection.

THE COURT: All right, then, go ahead.

MR. CHRISTIE: Oh, thank you.

So, Judge, from the perspective of defendants who are in state court, including two of my clients, we don't think that this bellwether approach is effective for a couple reasons. Number one, as was mentioned earlier, it seems to be an end run around the New Jersey Supreme Court's denial of the MCL application. Because as Mr. Stio mentioned, plaintiffs filed for the MCL, it was denied. And the primary basis for that was because of the lack of due process and the individualized issues. By going with a bellwether approach here, Judge, not only are you prejudicing the other federal defendants --

THE COURT: How are they being prejudiced?

MR. CHRISTIE: Well, I echo Mr. Stio's remarks with regard to the lack of ability to weigh in on individualized issues when the matters are ongoing. But my larger point, Judge, is that in addition to the other federal defendants, we're dealing with all of the other state defendants. And you can bet your bottom dollar that the results of whatever bellwether approach, results if it is put in place, will affect the state defendants who are one step removed. They don't have a dog in this fight because they're not in federal court. Yet, many of the issues that are going to be addressed and resolved will affect them one way or the other. They will not be able to participate in any of the discovery, in any of the depositions. And, you know, it will be a perverse review --

THE COURT: Well, why is that so? In other words, I don't have any control over what a state court judge is going to do with discovery.

MR. CHRISTIE: Understood, Judge. But as you can appreciate, the state court judges almost certainly will look to what you rule or what is ruled in any bellwether type situation and, you know, likely will be persuaded by it. And, again, without the input of the individual defendants with regard to their individualized issues that's a problem.

Just a few other quick points, Judge. With regard to the number of covered persons, one of my defendants, alleged in the complaint is that there's only about 13,000 covered persons that have assigned to Atlas. So to the extent they're under the impression that it's around 19 or 20,000 per case, that's not accurate, at least for one of my clients.

An issue was raised, Judge, with regard to a discovery master. Again, I'm not in federal court and I'm not before you, but it strikes me that that may be an approach that may help to relieve the burden on the Court and to deal with some of the more contentious issues.

Finally, Judge, with regard to Ms. Purcaro's discussion about wanting to know about individual plaintiffs and their covered person status. It may make sense, just to throw out the issue, to try to get fact sheets from these covered persons that covers those key issues. It could be done

perhaps under oath, under penalty of perjury, to address, you know, the bell -- the bottom level issues that affect the covered person status and the violations. So that may be something for the Court to consider.

So in sum, Judge, not having a case in federal court before you, just representing two state court defendants, to the extent that Your Honor does intend to move forward with discovery, we echo Mr. Stio's remarks that to the extent that happens it should be addressing common issues first.

It would be wonderful if the state defendants can somehow participate. I don't know how that's possible at the moment, I would have to think more about it. But a more collaborative approach as opposed to a cherry picking of bellwether cases we think would be most effective. Thank you.

THE COURT: Thank you.

(Court reporter interruption.)

THE COURT: Please spell your name for the record.

MR. CHRISTIE: Sure. My first name is Scott, last name is Christie, C-H-R-I-S-T-I-E.

THE COURT: Mr. Christie mentioned the idea of a discovery master. I mean, that's always something that we could think about.

MR. PARIKH: Yeah, I think -- so it is something to think about, Your Honor. I do think, though, that as Mr. Shaw said, and as you've said, that the bellwether approach is the

right approach.

And there are no discovery masters that have been appointed in any state court matter. The state court matters, if you just remember, the plaintiffs here did not file a single action in federal court. All of the cases were filed in state court. It was the defendants that removed them. And that's fine with us. But the idea of saying, like, oh, well, now we have state court defendants that are going to be negatively impacted because one group of defendants decided to remove their cases to federal court doesn't -- kind of rings hollow, as we talked about before.

With respect to the New Jersey Supreme Court and the multi county litigation decision, I don't want to get too far into the weeds, Your Honor, but the Court talked about a variety of things. That process in state court is set up for mass tort actions. And the Court essentially said that and said with respect to kind of the other part of our application which was, does this make sense from an efficiency perspective. The Supreme Court actually said that's not for the Supreme Court to decide, that's for the trial courts to decide. So we have put it to the trial court judges as to how they want to do it. Different counties have dealt with the cases in different ways.

Mr. Christie's -- one of Mr. Christie's cases, for example, is a case where there was a group of defendants that

were here in federal court that briefed the constitutional issue here. They were then part of a group that was remanded. And because of administrative issues in that court, they were never docketed. So they still are in the motion to dismiss phase. And they've asked for a stay which we said fine to. And the trial court judge requested and stayed those cases until there's a decision from the Third Circuit -- until there's a decision from the New Jersey Supreme Court. And they have asked for a stay through the Third Circuit.

So the idea that those parties are being prejudiced because there's a request to move these cases forward when they have purposefully tried to just keep their cases behind, again, just doesn't make sense to us. And what this is, is, from my perspective, a strategy from the defendants to essentially create complications and make discovery into a very large issue rather than putting legal issues on this relatively new law in relatively simple cases forward for adjudication.

And that's why we believe a bellwether approach is the right approach here. There are trial courts that have moved certain cases forward. We have a case that should be going to trial in 2027. That may be the first case. It's actively in discovery. There have been, as I said before, a multitude of document exchanges, inspection by expert witnesses, depositions that will be scheduled in August and September, likely.

So the idea that a bellwether is something that is an anathema here within the portfolio of cases that exist, it's just not true. It's already happening naturally in state court. And it is, from our perspective, you know, either whether it's a selection of bellwethers or a hybrid approach, it's the right approach here to move all of these cases forward in federal court.

MR. STIO: Your Honor.

THE COURT: Yeah.

MR. STIO: Just a couple points.

New Jersey has magistrate judges that handle discovery. I don't know if that's an option for the court.

THE COURT: Well, see, that's complicated because we wouldn't have a New Jersey magistrate handle it for obvious reasons. That's -- New Jersey judges have been recused from these cases, that's why I have been involved. You know, we certainly couldn't ask a magistrate judge in New Jersey to be involved.

MR. STIO: But maybe there's a magistrate judge --

THE COURT: Well, maybe one in Philadelphia to help with discovery issues. But my practice has always been to handle the discovery issues myself, but this may be a different case. But --

MR. STIO: The other issue, Your Honor, or the issue, the issues, and you're asking, well, why did you want a stay

and now you don't want a stay? We want a stay, right? But if we're going to go forward with discovery, what we don't want is not to have a say in the issues being decided and discovery being taken. And then the --

THE COURT: Well, it doesn't -- in other words, simply because there may be discovery going forward in another case doesn't prejudice you. You have an opportunity at a later time to take the discovery. There's no -- there's no estoppel or res judicata, is there?

MR. STIO: But when you start to label us bellwether, I think that we're not going to get the same opportunity. Maybe I'm wrong. I hope I am, but --

THE COURT: As I say, one of the possibilities, as we talked about, may be some generic discovery of the plaintiffs, not defense-specific. So we permit that to go forward. So any of the 40 defendants who want to participate in the generic discovery, you do it. And then we would go forward with discovery in two or three cases. And get them scheduled, get the discovery, get the depositions taken.

Will there be experts in these cases?

MR. PARIKH: Potentially.

THE COURT: And what area would there be?

MR. PARIKH: So I think if there's a defendant that claims they didn't receive nondisclosure requests, there may be email deliverability and receipt experts. But I think across

all cases there will be experts related to whether their compliance program met industry standards, whether the negligence that was caused was part of a, you know, either a business purpose if there is willfulness, for example, where some defendants may have specifically chosen that it's more profitable for us to not comply with privacy laws than comply, and others may have just, you know, missed the boat and not, you know, not realized that this law was something that could impact them. So I think an expert witness with respect to that.

MR. STIO: Your Honor, there would be experts. There would be a cyber security expert to look at the way these notices were issued in rapid succession on an unknown email domain with the same type of information sent multiple times from multiple people, whether that is indicative of a cybersecurity attack and plaintiffs reacted the way defendants reacted in not allowing those to be delivered, shutting down their portal. We have a cybersecurity expert.

I do want to touch on the point of assignors, right? New Jersey law, the District of New Jersey law that should be briefed, the obligation to produce information for assignors is on Atlas.

THE COURT: Right.

MR. STIO: And they have to go out and get the information. We could brief that and that would be a great

issue to brief because it would, I think, help you with your -- well, we can't depose 19,000 people.

THE COURT: What do you mean? They have information about the assignors, correct?

MR. STIO: They?

THE COURT: They know who their assignors are?

MR. STIO: Oh, no, they stand in the shoes of the assignors.

THE COURT: I agree.

MR. STIO: They have taken the position, hands off assignors. You can't get communications with us on assignors. We can't look at their email boxes because it belongs to assignors, not us. Can't have any information about how the assignors sent a document. And that's a strict requirement, it has to be sent by an authorized person, which Atlas is not. All of these --

THE COURT: What you're saying is, under Daniel's Law, the assignor has to send the request, the nondisclosure request, is that what you're saying?

MR. STIO: Absolutely.

THE COURT: Right.

MR. STIO: It's actually an authorized person, but I don't want to get into semantics.

THE COURT: Okay, right.

MR. STIO: Yeah.

THE COURT: Right.

MR. STIO: But there are issues.

THE COURT: We'll hear from you shortly.

Let's hear from counsel for Reuters.

Good morning.

MR. PRATT: Good morning, Your Honor. Marcel Pratt on behalf of Thomson Reuters defendants.

I just wanted to state for the record that Thomson Reuters also objects to the notion of a bellwether trial. Just because we don't think that there's a basis to group defendants or to send certain defendants ahead. What the defendants do as businesses, it's very fact-specific, right? This is not like an MDL situation where you have a single defendant that made a product or even a group of defendants that made products with the same active ingredient or participated in a conspiracy together. Everybody's business here is different. And I don't think plaintiffs know enough about each of the defendant's --

THE COURT: Mr. Pratt, you can only try one case at a time, would you agree with that?

MR. PRATT: Yes, Your Honor.

THE COURT: All right. So why shouldn't we proceed one case at a time?

MR. PRATT: Well, I think that if we proceed under the notion of a bellwether -- and I think someone else just raised this issue -- it sets the notion that what happens in

one case is going to bind defendant in subsequent cases or create precedent.

THE COURT: There's no basis for that. It's not going to bind anybody. As we know, in any case, the similar case is tried whether it's a bellwether or not, it may inform the party that's -- who's not involved in the case that's being tried. It may provide you with valuable information about the way the wind is blowing.

MR. PRATT: But I don't think that --

THE COURT: That's happens all the time.

MR. PRATT: Right. But because the defendants, their businesses are so different, what happens in one trial against one defendant might not be indicative of the other.

THE COURT: You may be right, it may not. We have to be practical. There's no way we can have 40 cases tried at once. So we have to take them -- so if you take a couple of them, move them forward, which is manageable both by counsel and the Court, then we'll see what happens. And maybe we try a couple of them and maybe that shows the handwriting on the wall for some defendants and for other defendants it means nothing.

MR. PRATT: Your Honor, but also --

THE COURT: And particularly when all of you were here wanting me to stay these cases from the beginning. And now all of a sudden you're concerned that a couple of cases may go forward. You're going to get your stay if you're not one of

the bellwether cases, you'll get your stay.

MR. PRATT: Right, Your Honor, that's the issue. It seems right now that the process for selecting who participates in the bellwether is somewhat arbitrary because there's not enough information to even distinguish or say which defendants should go forward. Which is why I think --

THE COURT: Well, let's assume for the moment all 40 cases went forward with discovery and they were all ready for trial, wouldn't it be arbitrary as to which one we pick?

MR. PRATT: I think you have more of a basis to decide which cases might make sense.

THE COURT: Why would I do that?

MR. PRATT: You would know what each of the defendants did. Maybe after discovery --

THE COURT: I'm not -- if I have to decide that, I'm not going to go through the record of each 40 and decide based on what the record says which one goes first. That's not a practical approach. How would I do that?

MR. PRATT: Your Honor, I just think, again, think it's premature at this point to say which cases should go to the bellwether. We wanted to note our objection for the record.

THE COURT: I understand.

MR. PRATT: Again, just to reiterate that, the defendants are so different, that the notion of a -- calling

these bellwether trials --

THE COURT: Well, that may be a word you don't like, but maybe I'm just being practical. We got to go start somewhere. And I can only try one at a time so we might as well get a couple out of the starting gate and get going.

MR. PRATT: Thank you, Your Honor.

THE COURT: Okay, thank you.

Anyone else?

Let me see if anyone else in the audience has any -- any concerns?

Okay.

MR. PARIKH: Your Honor, just briefly in response, I think, to what Mr. Stio said with respect to certain discovery issues, just the facts are incorrect, right? We haven't done any real discovery in these cases yet other than Rule 26 disclosures and the discovery that the plaintiffs gave to this entire group of defendants and others when we were doing the motions for remand. So with respect to email inboxes impositions and all those other things, we'll work all those things out in the discovery process. I just wanted to state for the record that just so it's not not responded to, that some of those things were either incorrect or misconstrued or maybe different in certain cases that Mr. Stio had that are different in other cases that other folks have.

THE COURT: If we went forward with the bellwether,

someone would have to make a decision as to which cases are going to go forward. So what would you propose? Maybe you would pick a couple and the defense would pick a couple?

MR. PARIKH: I think that would be fine, Your Honor. We can give a group of five to Your Honor. The defendants can pick five that -- you know, since there's some that want to move things forward and Your Honor picks.

THE COURT: Well, it just seems to me that the best -- the better approach would be for counsel to pick them rather than for me to pick them.

MR. PARIKH: We're happy to meet and confer with them on it, Your Honor. I'm not sure -- you know, as Your Honor mentioned, it's funny --

THE COURT: And if you can't, then I will obviously have to pick some cases.

MR. PARIKH: There's some that kind of emphatically want stays, but at the same time they want to move forward and we're happy to move forward. So we're happy to work through that with counsel and get something back if two weeks makes sense or three weeks? I don't know what makes sense to Your Honor.

THE COURT: Well, I'm thinking out loud now. If we went forward with some generic discovery of the plaintiff, not case-specific, just about your procedures and dealing with the assignor/assignee situation. And then we pick, say, maybe the

plaintiffs would pick two cases, defense side would pick two cases, and then we go forward with discovery and get the process moving. And if we had just four, that would seem to me could be manageable and there could be some coordination, particularly with specific discovery of the plaintiff. The four attorneys could be there at one time and examine the Atlas witnesses for the non-generic, we would know who they are. And then we start dealing with fact discovery, interrogatories, request for production of documents. And we move forward with the hope that objections would be kept to a minimum and that the parties would draft interrogatories and requests for production in a way to minimize objections. The idea is not to just ask for the moon knowing there are going to be objections and then we spend six months fighting about it.

MR. STIO: Your Honor, I understand.

THE COURT: It seems to me we just have to go forward and it's just not practical to go forward with 40 cases and just taking discovery and objections coming in and 40 sets of interrogatories, 40 requests for production of documents. We've got to sort of get this thing under control now. It's been around a long time. I think it's been about two years since we first met each other.

MR. PARIKH: That's correct, Your Honor.

And, Your Honor, with respect to the generic discovery -- and I apologize, Mr. Stio, for interrupting.

THE COURT: Yeah, go ahead.

MR. PARIKH: The defendants have a lot of it. They have already taken a 30(b)(6) deposition for seven hours, or six hours and 50-something minutes, of an Atlas representative that was related to the remand motion. And while a lot of it covered remand related issues, a lot of it got into the formation of Atlas, its systems, et cetera. I'm not saying it's complete, but definitely they had a lot of generic information there.

And then as Your Honor had ordered, we had produced covered persons lists to every single defendant. And so they have kind of the exact list of who the assignors are, what category of whether they're a law enforcement member, family member, et cetera, the dates that the nondisclosure requests were transmitted, et cetera. And a lot of that discovery also is already in terms of documents. So, for example, if I was a covered person and I signed up with Atlas on, you know, December 13th, 2023, and I signed a terms of service, the defendant has my terms of service. So a lot of that kind of generic discovery from the plaintiffs has already happened. We are happy to do whatever supplemental kind of narrow discovery is necessary as we select the two cases on each case. But I think we can move that forward in very short order.

THE COURT: What is the nature of the generic discovery, Mr. Stio?

MR. STIO: Your Honor, the generic discovery is worthless that they produced. It's worthless what they produced, okay. It's, we're going to pick out information and just believe us. So we got a list of assignors and it says: Law enforcement, family member. Okay. Does the family member reside in the home? Because that's what the statute requires. And if we are going to enforce the statute we're going to look at what it says. They don't give us that. They don't give us what category of information in terms of is the phone number published or unpublished. And we're not going to get that until we get documents. They're not giving documents, they're giving a spreadsheet, not the underlying information.

We asked for information that they use to verify covered persons. They said come over to our office, you can look at a PBA list, which doesn't have family members, can't copy it, you could take notes, and that's good enough. No.

So if you're going to go with the bellwether, that's fine. But don't think that you're appeasing the defendants with this generic discovery because it's worthless.

THE COURT: Well, maybe that won't be necessary. Maybe that's complicating matters too much. Maybe we ought to just go forward with the four. Maybe bellwether isn't a word that's appropriate, but four cases so that we can move this forward. Because I don't see how the train can move forward unless we pick several cases and get it moving, and then set

some deadlines so that it isn't ten years before it's tried.

MR. PARIKH: That's fine with us, Your Honor.

THE COURT: Now, of course, sometimes what happens when cases are picked out, to use the bellwether analogy, but they go forward and they settle and then you have to start from the beginning. I've had that experience in handling an MDL. But I think that's just something, a chance you have to take.

So it seems to me in listening to the discussion here that we ought to begin to figure out a discovery plan for these cases. And let's pick -- if plaintiffs want to pick two cases and I don't know how the defendants would confer and determine two cases. Mr. Stio, maybe you could just have -- lead the discussion with defense counsel about two cases. And it seems to me, what, within -- we have vacations coming up. Today is the 29th. Is a month time --

MR. PARIKH: A month is plenty of time, Your Honor.

THE COURT: To submit a proposed discovery plan?

MR. STIO: Judge, one question. When you say proposed discovery plan, I think it should be, to the extent necessary, four discovery plans if there's two cases on each side.

THE COURT: Sure, that makes sense, four. You know, we could do it -- I don't know how long it would take to do that. I know vacations are coming up. I'm going to be away for a couple weeks in August. So at least whether I could have

it before I -- by maybe toward the end of July and we'll see where we go. And maybe -- and then maybe have another conference here in those four cases maybe toward the very end of July or first couple of days of August if people are going to be around. I don't want to interfere with anybody's vacation.

MR. PARIKH: End of July is great for us, Your Honor.

THE COURT: It seems to me it would be worthwhile for you to send me whatever proposals you have. And then I'll schedule another status conference.

MR. STIO: Under the framework of two cases each, Your Honor?

THE COURT: Yeah. And we'll say, how about by the 20th of July? Would that be possible to do that, to submit something to me by the 20th, the names of the cases to go forward and a proposed plan? If you have different plans, that's fine, just get them to me by the 20th and then I'll try to schedule something shortly thereafter where we can get together here to talk about it so we can get the ball rolling.

MR. STIO: Your Honor, the only issue -- and we'll try and get it done.

THE COURT: Yeah.

MR. STIO: The 45 cases, I have to try to confer with defense counsel in those cases to pick out two. I may not be able to get two cases and have them meet with the two

defendants by the 20th, I'm just not sure.

THE COURT: Well, just see what you can do. I understand. If it's easier on the plaintiff's side, maybe if you picked out your two cases sooner, then you could advise at least Mr. Stio and he could get the word around so that you have made your picks and then that leaves 38 or 39 for them to pick their two.

MR. PARIKH: That makes sense, Your Honor.

THE COURT: And then we can see if we can go forward with this and do something in an orderly fashion.

All right. Is there anything else we need to do today?

MR. PARIKH: The only one other thing I had, Your Honor, there is a couple of defendants that never sent the Rule 26 disclosures to us.

THE COURT: Which ones are they?

MR. PARIKH: Quantarium and Innovative Web. I believe they're both represented by Gordon Rees. We never got Rule 26 disclosures from them.

THE COURT: Are counsel for those here?

Come forward, please.

MR. PARIKH: And the other two were eMerges and Sterling Data Corporation, which I think we have been in conversations with them. So just for the record, we haven't gotten them, but I will confer with those lawyers since we

heard back.

THE COURT: Good morning.

MS. MCCUSKER: Good morning, Your Honor. Rebecca McCusker on behalf of Quantarium and Innovative Web. I am filling in for John Mills.

I can advise you that they are forthcoming, the initial disclosures. So they should be received shortly.

THE COURT: All right, very good. Thank you.

Anything else?

MR. STIO: No, Your Honor.

MR. PARIKH: Nothing from the plaintiffs, Your Honor.

THE COURT: Hope you all have a wonderful 4th of July weekend.

MR. PARIKH: You too, Judge. Thank you.

THE COURTROOM DEPUTY: All rise.

(Proceedings concluded at 11:17 a.m.)

- - - - - - - - - - - - - - - - - - - - -

**FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

- - - - - - - - - - - - - - - - - - - - -

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/ Kimberly Wilson, RMR, CRR, RDR 7/6/2026

Court Reporter/Transcriber